UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) Crim. No. 05-35-B-W |
| BRIAN MICHAUD, | ) |
| | ) |
| Defendant. | ) |

**RECOMMENDED DECISION ON MOTION TO SUPPRESS**

Brian Michaud, who is charged in a one count indictment with possession of a firearm in violation of 18 U.S.C. § 922(g)(1), has filed a motion to suppress at trial any evidence seized as a result of what he describes as an unlawful motor vehicle stop by law enforcement authorities. (Docket No. 7.) Michaud claims that the pickup truck in which he was a passenger was stopped without sufficient articulable suspicion of wrongful conduct in violation of the Fourth Amendment. I now recommend the court adopt these proposed findings of fact and deny the motion.

**Proposed Findings of Fact**

On November 5, 2004, at approximately 11:55 p.m., Peggy Wagner, a dispatcher for Penobscot Regional Dispatch, received a telephone call forwarded to her from the Maine State Police. She spoke with Robin Cobb who resides on the Weir Pond Road in Lee, Maine. Cobb conveyed information to Wagner that ultimately resulted in Wagner making the following entry into the CAD Master Call Table:

> Ongoing issues w/ Brian Michaud. He called tonight and said, "Your son is going to pay." He was at the res tonight looking for a girl named Danielle her son is dating about 15 mins ago. Left in dark blue/light blue pu, possibly GMC. Neighbor said she saw his veh return and drive by the res and heard a gun shot. Veh left and went into the woods and hasn't

come out yet.  He is drunk.  Compl also said she drove her car off the road
on her way home on R6 because she was so nervous.

(Gov't Ex. A.)  Shortly thereafter Tracy Erickson, another regional dispatcher working alongside Wagner, radioed Michael Knights, a Penobscot County deputy who was working in the vicinity of Route 6 and the Weir Pond Road in Lee.  Erickson told Knights the following:

> 125, just received a call Robin Cobb, Robin Cobb.  She lives at 7 Weir
> Pond Road, 7 Weir Pond Road in Lee.  This is going to be in reference to
> ongoing issues with a Brian Michaud.  Apparently he called tonight and
> said, "Your son is going to pay."  End of quote.  He was at the residence
> tonight looking for a girl by the name of Danielle that her son is dating.
> Left in a dark blue over light blue pickup about 15 minutes ago, possibly a
> GMC.  Neighbor said she saw this vehicle return and drive by the
> residence and then heard a gun shot.  The vehicle left again and went into
> the woods and hasn't come out yet.  This complainant is also stating that
> she drove her car off the road on her way home on Route 6 because she
> was so nervous, may possibly be the 55 you were looking for.

(Govt' Ex. D.)[1]  Knights, the deputy sheriff assigned to Penobscot County's Zone 1, the vast rural area east and north of Lincoln, Maine, had already been dispatched to the area of Route 6 close to the Weir Pond Road because an anonymous motorist had phoned in a report of a motor vehicle with a broken windshield off the road in the ditch.[2]  Deputy Knights was familiar with Robin Cobb and the location of her home, having been to the residence three to five times in the past.  Approximately a month prior to these events he had gone there as back up to Trooper Fisk of the Maine State Police who was investigating another incident involving Michaud and Robin Cobb's son.

---

[1]  The government also submitted a transcript of this communication with its response to the motion. (Docket No. 9, Elec. Attach. 2.)  There is also a cassette audio tape available in the file.

[2]  Robin Cobb's vehicle was the one in the ditch with the broken windshield, but she had not reported the accident until a later call to Peggy Wagner.  At the time of these events Knights did not know her vehicle was the one he was dispatched to find.

As Knights was receiving the foregoing communication from Tracy Erickson a motor vehicle came into view that was proceeding along Route 6 away from the vicinity of the Cobb residence and toward the Thomas Hill Road. (See Gov't. Ex. E.) Seeing any vehicle around midnight on Route 6 in this area is unusual. Knights regularly patrols the area and has observed that after Raymond's Variety Store closes at 11:00 p.m. until about 3:30 a.m. when the pulp trucks start rolling one can sit on Route 6 for over 10 minutes without seeing a single vehicle pass. In fact, the vehicle that appeared as Erickson spoke on the radio was the only other vehicle in that area of Route 6 visible to Knights. Knights saw that the vehicle was a pick up truck and was dark in color. Eventually he ascertained that the pickup was two toned and was either an older model GMC or an older model Chevy, two makes that are often almost identical in appearance. However, the most outstanding feature of the truck was a homemade tool box attached to the bed of the truck. Knights immediately asked the dispatcher to confirm whether the vehicle he sought had a toolbox on the back.

Erickson then called Cobb to verify the existence of the toolbox. (Wagner, who had taken the original call, was otherwise engaged and therefore not available to confirm that the original description from Cobb included the toolbox. Indeed, it had.) Once Erickson received confirmation from Cobb she radioed confirmation to Knights.

In the meantime events were unfolding before Knights. The truck was traveling west on Route 6 toward Lincoln, Maine, and Knights was a considerable distance behind it. At the intersection of the Thomas Hill Road the vehicle turned off Route 6 and proceeded up a rather steep hill. The Thomas Hill Road eventually circles around onto the Skunk Hill Road, not too far from Cobb's home at the intersection of the Skunk Hill

Road and Weir Pond Road. In fact, the truck was ultimately stopped only 2.4 miles from Robin Cobb's home. Because the pickup was pulling away from him, Knights turned on his blue lights when he turned onto the Skunk Hill Road. The vehicle did not immediately stop and Knights became concerned that a chase might commence. He started to radio Erickson to ascertain the location of his nearest backup, but before he could say anything Erickson radioed to him that she had confirmed that the toolbox was on the pickup truck. (The Government played the tape of these radio broadcasts and it is abundantly clear that events unfolded quickly.) Knights then questioned her about backup and then quickly told her to disregard that request because the pickup was coming to a stop. Brian Michaud was identified as a passenger in the pickup and these charges apparently ensued.

## Discussion

Michaud's pleadings in support of his motion are terse. He merely says this stop and detention was effected without articulable suspicion and cites Terry v. Ohio, 392 U.S. 1 (1968), and United States v. Kimball, 25 F.3d 1 (1st Cir. 1994). There is no discussion of how the facts of this case might relate to the general legal principles contained in those cases. During oral argument following the Government's evidentiary presentation, Michaud suggested that his argument contained two prongs: (1) that there was no reasonable, articulable suspicion of any criminal activity afoot based upon the information that Knights was told by his dispatch; and (2) that even if there was a reasonable articulable suspicion of criminal activity, it was not particularized to the pickup that Knights stopped and therefore the stop of the pickup violated the Fourth Amendment.

Reasonable suspicion must be determined on a case by case basis, and that determination "entails broad-based consideration of all the attendant circumstances." United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001). A reviewing court must "make a practical, commonsense judgment based on the idiosyncrasies of the case at hand." Id. Courts deal with reasonableness determinations all the time, as Justice O'Connor has pointed out in the context of 28 U.S.C. § 2254:

> The term "unreasonable" is no doubt difficult to define. That said, it is a common term in the legal world and, accordingly, federal judges are familiar with its meaning. For purposes of today's opinion, the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law.

Williams v. Taylor, 529 U.S. 362, 410 (O'Conner, J., concurring). The First Circuit, considering the discretion accorded federal judges in making upward departure decisions under the then mandatory federal sentencing guidelines, has noted "[r]easonableness is a concept, not a constant." United States v. Ocasio, 914 F.2d 330, 336 (1st Cir.1990).

Applying the concept of reasonableness to the Fourth Amendment intrusion in this case leaves me with only one inescapable conclusion, Deputy Knights held a reasonable articulable suspicion that "criminal activity may be afoot," Terry, 392 U.S. at 28, and that the pickup truck he sought to stop may be involved in that activity. Knights was no stranger to the Cobb/Michaud contretemps, having responded to the scene before and having learned of allegations that Michaud harbored ill will toward Cobb's son. It was an ongoing problem. On the night in question Knights was told by dispatch that Michaud had very recently made a threat against the son to his mother. Michaud was in the area. A neighbor had seen the truck that Michaud was associated with return to the vicinity of Cobb's house and heard gunshots fired. Given that information, any police

5

officer who did not have a reasonable articulable suspicion that criminal activity might be in process, including genuine concerns about violent criminal conduct, would have been derelict in his duties. The first prong of Michaud's argument has no merit.

Nor does his argument that Knights lacked any basis in reason to connect the two-toned pickup truck to the allegations concerning Michaud and the gun shots. Knights knew he was looking for a two-tone GMC pickup. Lo and behold, within one and one-half miles of the complainant's residence (see Gov't. Ex. E, Point B, the spot where vehicle was first sighted by Knights) he sees a pickup truck matching that description. He follows it. It makes a left hand turn up a road that eventually will circle back to the complainant's residence. It is past midnight in a rural area where there is literally no traffic, no open businesses, and just not much going on except these events. Although he turns on the blues prior to confirming the existence of a toolbox, he confirms the existence of the toolbox before the suspect vehicle pulls over. If I were a betting person, I would place the odds well beyond 2:1 probability that this truck was the truck I was looking to find. The degree of certainty Deputy Knights needed to undertake the limited intrusion of a motor vehicle traffic stop is much lower than a preponderance of the evidence. Alabama v. White, 496 U.S. 325, 330 (1990) (observing that reasonable suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence"). Deputy Knights did not violate Michaud's Fourth Amendment right to be secure against unreasonable seizures of his person or effects.

## Conclusion

Based upon the foregoing, I **RECOMMEND** that the court adopt these findings of fact and **DENY** the motion to suppress (Docket No. 7).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated: July 25, 2005